IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AIDA L. HODGE,**                                    Case 4:13 CV 2788

    Plaintiff,

    v.                                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                        MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Aida Hodge filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C § 636(c) and Civil Rule 73. For the reasons stated below, the undersigned affirms the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB on January 20, 2011 and SSI on January 26, 2011 alleging an onset date of December 1, 2010. (Tr. 195-96, 197-203). Plaintiff applied for benefits due to obstructive sleep apnea, uncontrolled diabetes, depression, anxiety, panic attacks, and degenerative disc disease. (Tr. 229). Her claims were denied initially and upon reconsideration. (Tr. 129-37, 147-55). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 36). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on December 5, 2012, after which the ALJ found Plaintiff not disabled. (Tr. 16-35). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on December 18, 2013. (Doc. 1).

**FACTUAL BACKGROUND**

*Personal Background and Testimony*

Born August 29, 1954, Plaintiff was 56 years old as of the alleged onset date. (Tr. 29). Plaintiff had completed the 11th grade. (Tr. 43). She tried to get her GED in September 2011, but was unsuccessful because of her problems concentrating. (Tr. 43). Plaintiff last worked from February 2012 until August 2012 in telephone sales. (Tr. 43). She claimed she left the job due to "panic attacks, [and] the sleep apnea. I would fall asleep, you know, at my job". (Tr. 44). Her prior work history involved telephone sales. (Tr. 216).

Plaintiff lived in a house with her husband. (Tr. 41). She had her driver's license and mainly used it to drive herself to doctor's appointments, which were about 15-20 minutes away. (Tr. 42-43). She described her normal day as spent in bed or on the couch watching TV. (Tr. 48). She said she had lost interest in caring for herself, her personal hygiene, and her clothing. (Tr. 240). Plaintiff stated she did the dishes and some other things, but her husband did the majority of the housework. (Tr. 49). She did not perform any shopping, attend church, or otherwise leave the house, unless for a doctor's appointment. (Tr. 49). Plaintiff testified she was capable of picking up her granddaughters who weighed approximately 35 pounds. (Tr. 50-51).

Plaintiff testified she had tried both a CPAP and BiPAP machine to alleviate her sleep apnea symptoms, but neither worked. (Tr. 47). She claimed her mental issues and the sleep apnea prevented her from performing her former work. (Tr. 46). "[She] couldn't really say" if there were any physical ailments affecting her ability to work. (Tr. 48). Plaintiff testified she had diabetes, high blood pressure, and depression; and was prescribed medications for all three. (Tr.

2

51-52). She described her symptoms of depression as "crying all the time" and the inability to get out of bed at least twice a week (Tr. 52-53). Plaintiff testified she frequently had panic attacks that caused difficulty breathing, her body to tingle, and her heart to race. (Tr. 53).

*Relevant Medical Evidence*

*Ritha Kartan, M.D.*

At two sleep studies in 2007, Plaintiff had sleep efficiency scores of 51.5% and 60.2% but both studies found she had abnormal sleep architecture; Plaintiff was diagnosed with obstructive sleep apnea. (Tr. 272, 285, 291-93). At two sleep studies in June and October 2009, Plaintiff slept 29 minutes and 37 minutes respectively, and she said this was representative of a normal night's sleep. (Tr. 272-73, 285). However, in August 2009, Plaintiff slept for 277 out of 474 minutes for a sleep efficiency of 58%. (Tr. 288). Plaintiff said she was prescribed a CPAP machine in 2007, but she no longer used it. (Tr. 272). She reported sleeping only two hours on a typical night resulting in daytime sleepiness around 2:30 p.m. (Tr. 282). In August 2009, Dr. Kartan prescribed a BiPAP machine to help Plaintiff sleep but she still reported daytime fatigue. (Tr. 284). Dr. Kartan assessed Plaintiff with a three out of 24 on the Epworth Sleepiness Scale.[1] (Tr. 284). He questioned whether her tiredness could be due to Zoloft, an anti-depressant known to cause sedation in some patients. (Tr. 284). Plaintiff did not follow up with Dr. Kartan after the October 2009 appointment. (Tr. 280).

---

1. According to its website, the Epworth Sleepiness Scale is "a self-administered questionnaire with 8 questions [that] provides a measure of a person's general level of daytime sleepiness, or their average sleep propensity in daily life." Dr. Murray Johns, What the Epworth Sleepiness Scale Is and How to Use It, *The Epworth Sleepiness Scale,* http://epworthsleepinessscale.com/about-epworth-sleepiness/ (last visited Feb. 3, 2015).

*Anne Stover, M.D.*

On February 22, 2011, Dr. Stover, examined Plaintiff, a patient since September 2003, and filed a medical report to the Bureau of Disability Determination. (Tr. 298). Dr. Stover reported Plaintiff had suicidal thoughts, no thought disorder, sleep disturbances, was forgetful with regard to her medications and dates, had memory difficulties, was self-isolating, and could not concentrate long enough to complete tasks. (Tr. 299). Due to these symptoms, Plaintiff did not do household chores, drive, pay bills, go into public, maintain personal hygiene, or socialize with family or friends. (Tr. 299). Dr. Stover noted Plaintiff decompensated up to three times a week with panic attacks, which were frequently brought on by marital problems and her lack of effective sleep. (Tr. 299). She also reported Plaintiff had a limited ability to handle stress and would be incapable of managing her own benefits if granted. (Tr. 300). Dr. Stover diagnosed Plaintiff with major depression and diabetes. (Tr. 300).

Plaintiff underwent a variety of tests and labs, such as hematology, coronary and Vitamin D assessments, while under the care of Dr. Stover as evidenced by the medical records. (Tr. 307-328, 400-08). Plaintiff's diabetes was at times uncontrolled as shown by high glucose and hemoglobin levels in her A1C tests.[2] (Tr. 335-36, 428-30). She continued to see Dr. Stover throughout 2012 and reported depression, anxiety, and hypertension among others complaints. (Tr. 386-409).

---

2. The A1C test is commonly used to gauge a patient's management of their diabetes. The test reflects the patient's average blood sugar level for the past two to three months. The higher the A1C level, the poorer the patient's blood sugar control has been. http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/prc-20012585 (last visited February 25, 2015).

*Erin Klekot, M.D.*

On March 30, 2011, Plaintiff saw Dr. Klekot and Meghan DeGregory, LPN, for a psychiatric evaluation. (Tr. 354-58). Plaintiff reported the same symptoms of depression and anxiety as she had to Dr. Stover in February 2011. (Tr. 354-58). The mental status examination showed good eye contact, mood/affect within the normal range, intact memory, average intelligence, impaired concentration, and fair insight and judgment. (Tr. 357). The diagnosis was major depression, single episode, moderate, and Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 55[3]. (Tr. 357).

Plaintiff continued to see Dr. Klekot throughout 2011 and 2012. (Tr. 410-23). Dr. Klekot diagnosed Plaintiff with ADHD and prescribed Adderall. (Tr. 420). Plaintiff continued to have similar symptoms of depression and anxiety but Dr. Klekot's objective evaluations of Plaintiff's behaviors remained largely the same. (Tr. 410-23). In November 2012, Dr. Klekot filled out a Functional Assessment of Mental Disorders; she reported marked limitations in Plaintiff's concentration, persistence, cooperation, ability to tolerate high stress, and attention. (Tr. 424-25). Dr. Klekot further opined Plaintiff's moderate or slight limitations would increase if she was required to have contact with others or was placed under high stress. (Tr. 424-25). Dr. Klekot said Plaintiff was more likely to make mistakes, call off work, and get distracted by others if she was placed in a high stress work environment. (Tr. 425).

---

[3] The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.

*Consultative Examiner*

A consultative examination was completed on April 11, 2011 by Dr. Mary-Helene Massullo. (Tr. 344). Plaintiff claimed she could walk three to five miles, ascend or descend stairs normally, and required no ambulatory device. (Tr. 344). She could grasp and manipulate with each hand, had no motion restrictions, and was agile. (Tr. 346, 349-52). At the time, she was taking Metformin, Victoza, Lisinopril, IC simvastatin, IC hydroxyzine, and IC paroxetine. (Tr. 343). From her examination, Dr. Massullo opined Plaintiff was "able to do work related types of activities such as hearing, speaking, sitting, walking, standing, lifting, and traveling." (Tr. 347). While Dr. Massullo did note that Plaintiff reported depression and anxiety, she concluded that "[m]entally the patient appears grossly capable." (Tr. 347).

*State Agency Examiners*

On June 27, 2011, Richard Hamersma, Ph.D., reviewed Plaintiff's medical file and found Plaintiff had the capacity to perform simple, routine tasks on a sustained basis. (Tr. 364). The evidence in the record, including the GAF score and mental status evaluation from PsyCare, was consistent with moderate symptoms and impairments. (Tr. 364). Dr. Hamersma found Plaintiff's allegations of severe anxiety and panic attacks only partially credible. (Tr. 364).

That same day, Stephen Latchamsetty, M.D., concluded "no significant objective findings" existed to support a determination of severe impairment for Plaintiff's physical conditions. (Tr. 369). Dr. Hilda Martin, a pulmonologist, filled out a physical residual functional capacity report, indicating that Plaintiff was capable of medium level work with the only restriction in physical ability resulting from her morbid obesity. (Tr. 378).

6

*VE Testimony and ALJ Decision*

The ALJ determined Plaintiff had the severe impairments of obesity, anxiety disorder – not otherwise specified, major depressive disorder, and attention deficit-hyperactivity disorder. (Tr. 21). The ALJ concluded Plaintiff had the residual functional capacity ("RFC") to perform medium work except she may frequently balance, stoop, kneel, and crouch, may occasionally crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds. (Tr. 25). She was limited to work tasks that are simple and routine, undertaken in a work setting that is low stress, defined as precluding close, sustained focus or attention, strict production quotas, fast pace or time demands (such as assembly line work), arbitration, negotiation, confrontation, directing the work of, or being responsible for the safety of, others. (Tr. 25). There could not be more than infrequent changes in the job process, with ample opportunity for explanation; and no more than occasional interaction with others, on a superficial basis (no tandem tasks) but with no prohibition against others being present in the claimant's vicinity. (Tr. 25).

The VE testified with the above stated restrictions Plaintiff was capable of work in the economy. (Tr. 63). However, he stated that if Plaintiff was absent more than one day per month, she would not be able to work. (Tr. 63). The Plaintiff's attorney asked the VE whether a person who was off-task more than fifteen percent of the time could perform work in the economy and he responded in the negative. (Tr. 64).

Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could work in the national economy as a commercial cleaner, medium exertion only, day worker, or cook helper. (Tr. 29).

7

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which

8

substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) she failed to give appropriate weight to the opinions of treating sources and did not articulate her reasons for doing so; and (2) she did not meet her burden in the Step Five analysis. (Doc. 15, at 9, 13).

### *Treating Physician Rule*

Plaintiff argues the ALJ erred in giving "little weight" to the treating physician opinions of Drs. Stover and Klekot and that she did so without providing good reasons. (Tr. 28; Doc. 15, at 9). The Court notes that neither party disputes Drs. Stover and Klekot were Plaintiff's treating physicians.

Generally, the medical opinions of treating physicians are afforded greater deference than

9

those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* In contrast, *"*[a] physician's opinion based on a claimant's subjective allegations, rather than the medical evidence, is not entitled to significant weight." *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004). If the ALJ does not afford a treating source opinion "controlling weight", she must give "good reasons" why she refused to do so. *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). These reasons serve a second purpose, and that is to provide Plaintiff with an explanation for the ALJ's reasoning for a finding of not disabled. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

"If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the

10

length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* Even so, an ALJ is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the "good reasons" requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Stover*

Plaintiff contends Dr. Stover's opinion should have been given controlling weight by the ALJ. In February 2011, Dr. Stover reported Plaintiff had suicidal thoughts, sleep disturbances, was forgetful with regard to her medications and dates, had memory difficulties, was self-isolating, and could not concentrate long enough to complete tasks. (Tr. 299). Dr. Stover also documented that anxiety and stress prevented Plaintiff from completing simple tasks. (Tr. 299). Dr. Stover diagnosed Plaintiff with major depression and her opinion is entitled to controlling weight absent good reasons. (Tr. 300).

The ALJ provided good reason for according Dr. Stover's opinion little weight; it lacked supportability in the objective evidence. (Tr. 28); *see* § 404.1527(d)(2)); *see also Rogers*, 486 F.3d at 242. The ALJ found Dr. Stover's opinion to be based primarily on Plaintiff's self-reported symptoms and thus, she afforded it "little weight". (Tr. 28); *see Warner,* 375 F.3d at 39. *See also Mitchell v. Comm'r of Soc. Sec.,* 330 F. App'x 563, 569 (6th Cir. 2009) ("A doctor's report that merely repeats the Plaintiff's assertions is not . . . entitled to protections of the good reasons rule."); *Stoker v. Comm'r of Soc. Sec.*, 2008 WL 1775414, at *6 (N.D. Ohio 2008) (finding the ALJ did not err by rejecting doctor's opinions based substantially on Plaintiff's self-reported conditions).

For an ALJ to discount a treating source opinion, the "good reasons" given must be

"supported by the evidence in the case record". *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–407 (quoting SSR 96-2p, 1996 WL 374188, at *5); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection."). In other words, to be a good reason the purported reason must at least be factually correct. Here, the ALJ discredited Dr. Stover's opinion because it lacked objective medical support. At the time of Dr. Stover's opinion she had no objective evidence of Plaintiff's mental condition; her earlier record evidence describes little, if any, symptoms of depression or anxiety; and she prescribed no medication or treatment for these symptoms. (Tr. 308-318). It is only at the February 2011 appointment that Dr. Stover refers Plaintiff for psychiatric evaluation. (Tr. 307).

In articulating good reasons, an ALJ's reasoning may be brief; *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir. 2009), here, the ALJ delineated her reason — albeit succinctly — but nonetheless, it was adequate to explain to Plaintiff why this opinion was given little weight. *See Pasco v. Comm'r of Soc. Sec.,* 137 F. Appx. 828, 837-38 (6th Cir. 2005) (finding the ALJ's statement "[t]here is nothing objective to support any of these statements and the [ALJ] does not accept them" sufficient to meet the explanatory requirement). Thus, the ALJ did not err by affording little weight to Dr. Stover's opinion.

*Dr. Klekot*

Similarly, Plaintiff contends Dr. Klekot is a treating physician whose opinion should have been given controlling weight by the ALJ. In November 2012, Dr. Klekot reported marked limitations in Plaintiff's concentration, persistence, cooperation, ability to tolerate high stress, and attention. (Tr. 424-25). Dr. Klekot opined Plaintiff's moderate or slight limitations would

12

increase if she was required to have contact with others or was placed under high stress. (Tr. 424-25). Dr. Klekot further stated Plaintiff was more likely to make mistakes, call off work, and get distracted by others if she was placed in a high stress work environment. (Tr. 425). Her opinion is generally entitled to controlling weight absent good reasons.

The ALJ's reason for discrediting Dr. Klekot's opinion was that it was inconsistent with her own treatment notes. (Tr. 28). As an example of inconsistency, the ALJ points specifically to reports of Plaintiff's ability to pay attention and concentrate, as evidenced by four occasions when Dr. Klekot noted Plaintiff had normal attention/concentration. (Tr. 28, 411, 414, 418, 422). However, Dr. Klekot's opinion is not wholly inconsistent with the record because on twelve other occasions Dr. Klekot noted that Plaintiff's attention/concentration was impaired. (Tr. 354, 410, 412-13, 415-421, 423). If the ALJ does not provide good reason for discounting a treating physician's opinion, remand is appropriate unless harmless error exists. *Blakely*, 581 F.3d at 409.

The Sixth Circuit has found harmless error can be established, in limited circumstances, through an indirect attack of a treating physician's opinion. *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2005) (finding an ALJ could meet the "good reasons" requirement with "his analysis of [a doctor's] other opinions or his analysis of [claimant's medical] problems in general." *Hall,* 148 F. App'x at 470. In subsequent cases, the Sixth Circuit has made limited use of the indirect attack rule when an ALJ has thoroughly evaluated the record. *See e.g., Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (to satisfy an indirect attack, the ALJ must "identif[y] 'objective clinical findings' at issue [or discuss] their inconsistency with [the doctor's] opinion").

While the Court notes application of the harmless error doctrine is rare, in the instant case it is appropriate because the ALJ discussed in length the mental evaluations and corresponding restrictions for Plaintiff. (Tr. 25-28). Although the ALJ did not outright state she was discounting Dr. Klekot's opinion based on certain factors, she indirectly addressed the supportability of Dr. Klekot's opinion through a review of the medical and testimonial evidence. *See Hall,* 148 F. App'x at 470. For instance, the ALJ noted contradictory mental status findings (Tr. 26, 357, 410-423), a GAF score of 55 (Tr. 26, 357), Plaintiff's work history after the alleged onset date (Tr. 27, 43), and the Plaintiff's testimony regarding her daily activities. (Tr. 27, 29-51). "The fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when rejecting Dr. [Klekot's] opinion does not necessitate remand of Plaintiff's case." *Dailey v. Colvin*, 2014 U.S. Dist. LEXIS 82267, at *23 (N.D. Ohio) (citing *Nelson*, 195 F. App'x at 472).

While the treating physician rule was not strictly followed, its motivation was. Neither the Court nor Plaintiff was ever deprived of the ability to understand the disposition of the case because the ALJ provided a clear, comprehensible, and thorough reasoning as to her RFC. In this case, remand would be an "idle and useless formality" because the RFC is consistent with Dr. Klekot's opinion and the ALJ provided clear, yet indirect, reasoning for the weight given to Dr. Klekot. *Hall,* 148 F. App'x at 464.  The Court finds the ALJ's failure to give good reasons for discrediting Dr. Klekot's opinion was harmless error.

*Step Five*

Plaintiff also argues the ALJ erred at Step Five because the hypotheticals she presented to the VE did not accurately represent Plaintiff's abilities. (Doc. 15, at 13-14). More specifically,

the ALJ did not have credible evidence to support the hypotheticals presented and then ignored relevant VE testimony regarding Plaintiff's ability to work in the economy. (Doc. 15, at 14).

To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

First, the ALJ appropriately found that Plaintiff's physical condition was consistent with a medium level of work in the RFC. This determination is supported by substantial evidence in the record, for example none of the medical opinions including that of Dr. Stover –her primary care physician– delineated a restriction in range of motion, strength, or ambulation. (Tr. 299-300, 369, 378, 424-425). Dr. Martin's report showed no limitations in manipulation, balancing, stooping, kneeling, or crouching. (Tr. 372-73). Dr. Martin noted Plaintiff's morbid obesity as an obstacle to her ability to work, however the ALJ made appropriate accommodations for this

15

impairment in her RFC. (Tr. 26, 378). Thus, the RFC adequately represented Plaintiff's physical abilities and was thus based on substantial evidence.

Second, the ALJ appropriately accounted for Plaintiff's mental limitations in the hypotheticals posed to the VE. In the hypothetical, the ALJ stated the person could only perform simple or routine tasks with occasional social interactions but no joint tasks, and precluded any high stress environments. (Tr. 59-60). All of these limitations were contemplated in Dr. Klekot's opinion of Plaintiff's mental abilities. Thus, the hypothetical was an appropriate representation of Plaintiff on which the VE could testify and the ALJ could rely.

Lastly, Plaintiff contends the ALJ erred by not accepting the VE testimony regarding Plaintiff's likely absenteeism. As stated above, the ALJ must only consider the limitations she deemed credible in evaluating the VE testimony. *Casey,* 987 F.2d at 1235. Therefore, she did not err when discounting the VE testimony about Plaintiff's absenteeism because she did not find the opinion regarding her mental limitations, upon which this restriction was based, credible.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits is supported by substantial evidence, and therefore the Commissioner's decision is affirmed.

  s/James R. Knepp II
United States Magistrate Judge